GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     JESSICA JEAN HU
        ARASTU K. CHAUDHURY
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel.:    (212) 637-2726/2633
Fax:     (212) 637-2717/2750
Email: jessica.hu@usdoj.gov
        arastu.chaudhury@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.* GEORGE
MARKELSON, as Executor of the Estate of STEPHEN
MARKELSON, Deceased, PETER NADLER, and
LORRAINE WATERS,

                     Plaintiffs,

          v.

DAVID B. SAMADI, M.D., DAVID B. SAMADI, M.D.,
P.C., LENOX HILL HOSPITAL, and NORTHWELL
HEALTH, INC.,

                   Defendants.

**COMPLAINT-IN-
INTERVENTION OF THE
UNITED STATES OF
AMERICA**

17 Civ. 7986 (DLC)

---

UNITED STATES OF AMERICA,

                   Plaintiff-Intervenor,

          v.

LENOX HILL HOSPITAL, and NORTHWELL
HEALTH, INC.,

                   Defendants.

17 Civ. 7986 (DLC)

The United States of America (the "Government"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, alleges for its complaint-in-intervention as follows:

## PRELIMINARY STATEMENT

1.     This is a civil fraud action brought by the United States of America (the "United States" or the "Government") against defendants Lenox Hill Hospital ("Lenox Hill") and its corporate parent, Northwell Health, Inc. ("Northwell") (together, "Defendants"), under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733, to recover treble damages sustained by, and civil penalties owed to, the Government resulting from the submission of false and fraudulent claims for reimbursements to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare"). The Government also seeks to recover damages under the common law for payment by mistake of fact and unjust enrichment.

2.     This case relates to Defendants' actions during a time-period in which they employed Dr. David B. Samadi ("Samadi") as Chairman of the Urology Department at Lenox Hill.

3.     Defendants recruited Samadi from another New York City medical institution. At the time of Samadi's recruitment, Lenox Hill's Urology Department lacked both the prestige and surgical volume of competing facilities.

4.     To persuade Samadi to leave his position in a more established department, Defendants agreed to pay Samadi a compensation package that far exceeded fair market value. Moreover, Samadi and Defendants' employment arrangement was not commercially reasonable without taking into account the value of Samadi's referrals.

2

5.      Given that Samadi's compensation arrangement was neither fair market value nor commercially reasonable without taking into account the value of referrals, Defendants were prohibited by the Stark Law from submitting to Medicare claims for designated health services that had been referred to them by Samadi.

6.      Having made such a significant investment in recruiting Samadi, Defendants were incentivized to adopt practices that prioritized hospital revenues over regulatory compliance. In order to increase the revenues associated with Samadi, Defendants: improperly utilized residents to perform surgical procedures that were then billed as having been performed by Samadi; permitted Samadi to leave complex high-risk surgeries unattended, in order to facilitate Samadi billing for other surgical procedures that were being performed at the exact same time; and, as a direct result of their efforts to enable Samadi's constant presence in the operating suite, billed Medicare for medically unnecessary anesthesia and hospital services.

7.      As set forth in more detail herein, from July 1, 2013, through June 30, 2018, Defendants knowingly submitted, or caused to be submitted to Medicare, claims for reimbursement for: (1) endoscopic procedures that were performed, at least in part, by medical residents whom Samadi supervised while he was simultaneously engaged in a different complex surgery taking place in an adjacent operating room; (2) robotic surgeries for which, at some point during the surgery, Samadi left the operating room to supervise a different procedure; (3) office-based and laboratory services that, although they had not been personally performed by Samadi, were used to calculate the incentive component of Samadi's compensation; (4) hospital services provided in conjunction with Samadi's surgeries even though they were not medically necessary; and (5) designated health services referred to Lenox Hill by Samadi when his compensation from Lenox Hill was not fair market value and his employment arrangement was not commercially

reasonable without taking into account his referrals. Defendants submitted, or caused to be submitted, thousands of false and fraudulent claims to Medicare, and Defendants received payments based on those claims.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345.

9.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because the Defendants transact business in this district.

## PARTIES

10.     Plaintiff is the United States and is suing on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS"), and its component agency, the Centers for Medicare and Medicaid Services ("CMS").

11.     Lenox Hill is a hospital on the Upper East Side of Manhattan located at 100 East 77th Street, New York, New York, 10075.

12.     Northwell is a network of hospitals and health care facilities providing healthcare services throughout the New York City metropolitan area. Northwell owns and operates Lenox Hill.

## BACKGROUND

I.      **The False Claims Act and the Stark Law**

13.     The FCA establishes liability to the United States for an individual or entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used,

a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B).

"Knowingly" is defined to include actual knowledge, reckless disregard and deliberate

indifference. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id*.

14.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn,

commonly known as the "Stark Law," generally establishes the clear rule that the United States

will not pay for certain health services where the services resulted from a referral by a physician

who had an improper relationship with the health care provider submitting the claim. The statute

was designed to prevent losses that might be suffered by the Medicare program due to the

questionable utilization of designated health services.

15.     The Stark Law specifically prohibits a hospital from submitting Medicare claims

for "designated health services," as defined in 42 U.S.C. § 1395nn(h)(6)) from patients who were

referred to the hospital by physicians who have a "financial relationship," as defined in 42

U.S.C. § 1395nn(a)(2), with the hospital.

16.     In relevant part, the Stark Law provides:

(a) Prohibition of certain referrals

    (1) In general

    Except as provided in subsection (b) of this section, if a physician . . . has a financial
    relationship with an entity specified in paragraph (2), then –

   (A) the physician may not make a referral to the entity for the furnishing of designated health
       services for which payment otherwise may be made under this subchapter, and

   (B) the entity may not present or cause to be presented a claim under this subchapter or bill to
       any individual, third party payor, or other entity for designated health services furnished
       pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

17.     Included in the statutory definition of a "financial relationship," is a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. 42 U.S.C. §§ 1395nn(a)(2), (h)(1)(A), and (h)(1)(B).

18.     Although the Stark Law generally prohibits hospitals from submitting claims for designated health services where the hospital has a compensation arrangement with the referring physician, the statute also provides for certain qualifying exceptions. *Id.* § 1395nn(e).

19.     One of these qualifying exceptions is for those compensation arrangements where there is a "bona fide employment relationship" between the hospital and the referring physician. *Id.* § 1395nn(e)(2). In order to qualify for this exception, however, the compensation arrangement between the hospital and the referring physician must meet the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the employment arrangement would be commercially reasonable even if no referrals were made to the employer. 42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

20.     In the absence of a qualifying exception, the Stark Law provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under the statute. 42 U.S.C. § 1395nn(g)(1). The regulations implementing the Stark Law also expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

## II.     The Medicare Program

21.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is

based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

22.     Medicare has several parts, including Part A (which is primarily for hospital-based charges) and Part B (which is primarily for physician and other ancillary services).

23.     To assist in the administration of Medicare Parts A and B, CMS contracts with Medicare Administrative Contractors ("MACs"). *See* 42 U.S.C. §§ 1395h, 1395u. Hospitals and physicians submit claims for payment to MACs, and, in turn, MACs process medical claims for Medicare beneficiaries.

24.     Medicare enters into agreements with both hospitals and physicians to establish their eligibility to participate in the Medicare program. Once enrolled in the program, hospitals and physicians are required under Medicare to submit enrollment applications periodically to "revalidate" their enrollment information. For hospitals, this revalidation is submitted through the CMS 855A form. For physicians, the revalidation is submitted through the CMS 855I form. Both the CMS 855A and the CMS 855I contain a "Certification Statement" wherein the provider agrees to abide by the Medicare laws, regulations, and program instructions that apply to them. Specifically, the Certification provides that the hospital or physician:

> [A]gree[s] to abide by the Medicare laws, regulations and program instructions that apply to [the physician or hospital] . . . [] understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [physician or hospital's] compliance with all applicable conditions of participation in Medicare . . ..

25.     As part of the Certification Statement, the physician and hospital further agrees to: "not knowingly present or cause to be presented a false or fraudulent claim for payment by

7

Medicare," and to "not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

26.     In addition, hospitals and physicians also submit certifications along with each request for payment by Medicare.

27.     With respect to hospitals, as a prerequisite to payment by Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the MAC for items and services rendered to Medicare beneficiaries. Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator. These hospital cost reports also require that the hospital certify that: the information contained in the report is truthful and accurate; the submitted claim comports with all applicable instructions; the information is complete, based on all information known to the hospital; and the services were billed in compliance with applicable laws and regulations.

28.     Physicians submitting claims to Part B, either via the hard copy CMS 1500 form or electronically, are similarly required to certify that the physician is knowledgeable of Medicare's requirements and that the individual claim complies with applicable laws and regulations, including the Stark Law and Anti-Kickback statute.

29.     At all times relevant to this complaint, both Lenox Hill and Samadi submitted certifications relating to their revalidation of Medicare enrollment, as well as for payment of individual claims.

30.     Defendants' certifications were material to CMS's decision to allow Defendants to participate in the Medicare program, as well as its decision to accept Defendants' claims for payment for services rendered to Medicare beneficiaries.

**III.      Endoscopic and Complex Surgical Procedures**

31.      Medicare's implementing regulations establish requirements that must be complied with in order for a claim to be submitted to Medicare for payment. Guidance is also provided by the Medicare Claims Processing Manual, which prescribes additional rules that Medicare providers and suppliers agree to abide by in the certifications they submit in order to participate in the program.

32.      With respect to surgical procedures furnished in a teaching setting, the regulations provide the general rule that, "[i]f a resident participates in a service furnished in a teaching setting," payment by Medicare can only be made where "a teaching physician is present during the key portion of any service or procedure for which payment is sought." 42 C.F.R. § 415.172(a). The regulations go on to provide that:

(1) In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. . .

…(ii) In the case of procedures performed through an endoscope, the teaching physician must be present during the entire viewing.

*Id.*

33.      With respect to surgeries performed in teaching settings, the Medicare Claims Processing Manual further provides that "if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, i.e., he/she cannot be performing another procedure. If circumstances prevent a teaching physician from being immediately available, then he/she must arrange for another qualified surgeon to be immediately available to assist with the procedure." Medicare Claims Processing Manual, Chapter 12, Section 100.1.2.

34.      In the case of "Endoscopy Procedures," the Medicare Claims Processing Manual defines the term "entire viewing" as the portion of the procedure that "starts at the time of the

9

insertion of the endoscope and ends at the time of removal of the endoscope." *Id.* An endoscope is an illuminated optical, typically slender and tubular instrument used to look deep into the body and used in procedures called "endoscopy."

<u>**FACTUAL ALLEGATIONS**</u>

**I.     Samadi's Recruitment and Compensation**

35.     Lenox Hill first recruited Samadi from another hospital system in early 2013. At the time, as compared to other area hospitals offering residency programs in Urology, Lenox Hill's urology practice was limited in both scope and sophistication. Lenox Hill therefore viewed Samadi as a physician who could expand the hospital's footprint by bringing in more patients in a highly lucrative area.

36.     In particular, Samadi specialized in a complex surgery known as the Robotic Assisted Laparascopic Prostatectomy ("RALP"), which is a surgical procedure in which some or all of a patient's prostate is removed utilizing miniaturized robotic instruments. Whereas most urologists working in academic institutions average 50 to 100 RALPs a year, Samadi maintained an unprecedented surgical volume of 300 or more RALPs each year. Moreover, Samadi's patient base included wealthy internationals, who paid out-of-pocket for surgical services and were also willing to pay for ancillary and luxury medical services (e.g., private recovery rooms with reserved nursing staff).

37.     Lenox Hill's executive leadership was so eager to recruit and hire Samadi that they formally extended him an offer of employment even before having the terms of the offer approved by the Compensation Sub-Committee of the Board of Trustees. Indeed, by the time the Compensation Sub-Committee met to approve Samadi's compensation, Samadi's employment contract had, in fact, already been executed.

38.     In order to justify the exorbitant and unprecedented compensation paid to Samadi, Defendants analyzed the economic impact of Samadi's referrals to Defendants for designated health services. Indeed, without taking into account the revenue impact of these referrals, operating Samadi's practice would have resulted in Defendants suffering an economic loss of over a million dollars each year.

39.     It was only after taking into account the value of Samadi's "downstream" referrals to Lenox Hill that Samadi's compensation arrangement could be considered commercially reasonable. Once these referrals were incorporated into the analysis, Lenox Hill projected that it stood to gain several million dollars in revenue per year, thereby justifying paying Samadi a salary that far exceeded fair market value.

40.     Defendants' internal documents refer to the impact Samadi would have on hospital revenues outside of his own personally performed services as Samadi's "contribution margin." These documents reflect that, in calculating Samadi's contribution margin, Defendants considered the revenues generated by referrals for designated health services, such as in-patient hospital services and "ancillary services" like pathology, radiology, and laboratory work, as well as revenues associated with "additional referral spinoff" such as the revenues associated with open heart surgery or hip/knee replacements undertaken by Samadi's patients.

41.     In evaluating Samadi's employment package, Northwell's board acknowledged that the compensation should not be assessed on the basis of "fair market value," but instead using a "business judgment" standard. The analyses that Lenox Hill conducted on Samadi's referral activity suggests that Defendants' judgment was that the increase to Lenox Hill's business justified a compensation package that exceeded fair market norms.

42.     Samadi's extraordinary compensation included a base salary that was $1 million more than what Samadi previously earned at his prior position, as well as a lucrative incentive bonus calculated from the net collections associated with Samadi's professional services. For the incentive bonus, Defendants agreed to pay Samadi 75% of all collections made within a year that exceeded $2.3 million, but were under $2.5 million. For all collections made within a year that exceeded $2.5 million, Defendants agreed to pay Samadi an astounding 90% of these collections. This compensation arrangement remained in place from July 2013 through June 2018.

43.     Given these circumstances, in order to realize a return on their investment in Samadi, Defendants were highly motivated to maximize the hospital revenues associated with Samadi's surgical practice.

## II.     Samadi's Operating Room Practice

44.     In furtherance of their goal of maximizing Samadi's billable time, Defendants agreed to additional terms of employment that enabled Samadi to perform surgical procedures, including complex and high-risk surgeries, with the greatest speed and efficiency possible.

45.     These additional terms included: the purchase of additional robotic equipment, minimizing the amount of time needed to reset the operating room in between patients; designing the layout of the operating room to meet Samadi's precise specifications, thereby enabling him to work in the most efficient manner possible; guaranteeing Samadi three days of exclusive access to the operating room for performing robotic procedures; guaranteeing Samadi one day of exclusive access to the operating room adjacent to the operating room in which he was performing robotic procedures, so that he could concurrently bill for ambulatory surgical procedures; and providing Samadi with his choice of operating room personnel, including nurses, technicians, and anesthesiologists.

12

46.     All of these accommodations enabled Samadi to perform, and Defendants to bill for, as many surgeries as possible.

47.     Consistent with the terms of Samadi's employment agreement, upon Samadi's arrival at Lenox Hill, Samadi and Lenox Hill commenced an overlapping surgical practice that had been previously prohibited at the hospital.

48.     On the days on which Samadi conducted both ambulatory and robotic surgeries, Samadi was simultaneously assigned to two operating rooms. Hospital employees referred to these rooms by their assigned numbers, OR 21 and OR 25.

49.     Generally speaking, a medical resident, in his second or third year of specialized urology training at Lenox Hill, which corresponded to the fourth and fifth years of the Lenox Hill Urology Department's six-year residency training, would be assigned to staff OR 21. This assigned resident remained in OR 21 throughout the duration of the procedures that occurred in the operating room and performed significant portions of the procedure without any direct supervision by Samadi or any other attending urologist.

50.     One of the most common procedures performed in OR 21 was the transurethral resection of the prostate, often referred to in the field as the "TURP." The TURP is an endoscopic surgery used to treat urinary problems due to an enlarged prostate. During a TURP, an instrument is inserted through the tip of the patient's penis and into the urethra, the tube that carries urine from the bladder, the surgeon then uses a surgical instrument to manually scrape away at the excess prostate tissue that is blocking urine flow. Notably, throughout the majority of the TURP, the surgeon is actively removing tissue from the patient's prostate through the narrow urethra.

51.     In OR 25, which was adjacent to OR 21, Samadi himself performed complex robotic procedures, the majority of them RALPs, using the Da Vinci surgical robot. Although residents were occasionally present in the operating room in furtherance of their education, Samadi himself was the sole surgeon to operate the surgical console of the Da Vinci robot during the RALPs performed in OR 25. RALPs are surgical, complex, high-risk procedures that can only be performed by experienced surgeons with extensive training in this specialized procedure.

52.     For both the surgeries occurring in OR 21 and OR 25, Samadi was the only board certified surgeon assigned to the procedures, and the payment claims submitted by Lenox Hill for the procedures that took place in both rooms listed Samadi as the billing physician.

53.     Unbeknownst to the patients, however, Samadi's overlapping surgical practice necessarily required him to step away from the patients undergoing surgery in each room.

54.     Although Samadi would be present in OR 21 during the execution of the patient consent form, the time out, and other portions of the procedure that he deemed critical, he would not be present in the operating room for the period of time the Medicare Claims Processing Manual defines as the "entire viewing," namely the entire time that the endoscope was inserted in the patient.

55.     Practically speaking, significant portions of OR 21 procedures, including extended portions of procedures that involved removing tissue from the patient's prostate, were undertaken by residents in their second and third year of specialized urology training while Samadi himself simultaneously performed robotic surgery in another room.

56.     Similarly, to the extent that a robotic surgery occurring in OR 25 overlapped with a procedure in OR 21, and the procedure in OR 21 required Samadi's attention, either as

scheduled or due to a resident calling upon Samadi for assistance, Samadi would step out of the complex robotic surgery in OR 25 prior to the conclusion of that robotic operation.

57.     While Defendants and Samadi generally sought to schedule the procedures occurring in OR 21 and OR 25 in such a way as to minimize the instances in which Samadi would be called out of OR 25 to attend to a surgery in OR 21, residents in OR 21 were consistently instructed to call upon Samadi should they require more assistance during the portions of OR 21 procedures that they were scheduled to perform outside of Samadi's presence. Due to Samadi's packed schedule, however, Samadi was most often performing a RALP surgery in OR 25 during these unscheduled interruptions.

58.     Residents' willingness to call upon Samadi unexpectedly, perhaps because the procedure exceeded their capacities, varied based on the individual. Due to residents' survey responses made to the residency program accrediting organization, however, Defendants were aware that residents in the program had serious reservations about Samadi's commitment to their education. Moreover, throughout this time-period, Samadi served as both the Urology Department Chairman as well as the Urology Residency Program Director. Samadi therefore had unique and considerable authority over residents in the Lenox Hill urology residency program. Importantly, Samadi alone controlled whether residents received strong recommendations for fellowship programs or future employment. In light of this, some residents felt understandable pressure not to intrude on Samadi while he was engaged in a different complex operation, lest, to their serious professional detriment, Samadi perceive them as incompetent or inadequately prepared. Defendants therefore structured Samadi's surgical schedule in a manner that placed tremendous pressure and responsibility on the residents, young surgeons at the very start of their

careers whose future livelihoods depended in many ways on the opinion of the man whose overlapping surgical practice they had been tasked with enabling.

59.     In the instances where Samadi needed to step out of a surgery in OR 25, either due to a scheduled overlapping period or an unexpected exigency, he would leave the surgery in OR 25 in a "frozen" or suspended state. During this time, the patient would remain under general anesthesia, attended to by an anesthesiologist. Yet, for the period of time that the patient awaited Samadi's return from OR 21, the patient in OR 25 remained unattended by any board certified urologist other than Samadi, who was actively occupied attending to the patient undergoing surgery in OR 21. Defendants did not assign any other attending urologist to be immediately available to the patient undergoing surgery in OR 25 in Samadi's absence.

60.     Furthermore, although Defendants had actively recruited patients to come to Lenox Hill so that they could have the benefit of Samadi's expertise and skills, they failed to make any information regarding Samadi's overlapping practice available to patients.

61.     Defendants took great care to advertise nationwide Samadi's skills as a surgeon, and they made concerted efforts to encourage patients from all over the country to seek out Samadi specifically. Defendants went so far as to prominently display Samadi's photograph on advertisements for both the hospital and the Urology Department. That said, even having taken steps to recruit patients to the hospital specifically to see Samadi, Defendants did not take equal care to help patients understand the degree to which Samadi himself would be physically present during their surgeries. Defendants took no steps to ensure that either Samadi, or his residents, ever informed any of Samadi's patients that Samadi was simultaneously assigned to two operating rooms, and, as a result, would: (a) not be physically present for extended portions of

the ambulatory surgeries performed on his patients; and (b) may have to step out during a robotic procedure.

62.     Defendants accordingly failed to ensure that Samadi's patients were informed of the nature of Samadi's surgical involvement in their operations. Although Medicare rules and regulations require that health care providers obtain and document patient consent prior to any surgical procedure, Defendants did nothing to advise patients of Samadi's overlapping surgical practice.

63.     By failing to properly inform patients of this—information that patients would have no way of finding out for themselves—Defendants violated the implied trust that patients place in their healthcare providers.

## III.   Unnecessary Medical Procedures

64.     Furthermore, in their desire to maximize Samadi's time in the surgical suite, Defendants adopted practices that resulted in patients receiving, and Medicare being billed for, medically unnecessary hospital services.

65.     To facilitate his availability to perform surgeries, Defendants allowed Samadi to utilize OR 21 to perform procedures that did not require the use of an operating room. These procedures, most notably cystoscopies and cystograms, were minor diagnostic interventions that did not require either general anesthesia or the participation of operating room staff. While Defendants required other urologists to perform these procedures in the hospital's radiology suite, they permitted Samadi to utilize OR 21, so as to minimize the time that Samadi would have to leave the operating area, and therefore not be available to perform surgery.

66.     Moreover, because Defendants also required adherence to standard operating room protocols for any procedure occurring in OR 21, Samadi's patients who underwent these

diagnostic interventions in OR 21 occasionally received operating room services, including anesthesia services, which were medically unnecessary. The medical personnel staffing OR 21 required that operating room procedures, such as the presence of operating room nurses or the administration of monitored or general anesthesia, be followed even in cases where Samadi's patient was not actually undergoing a procedure in which these services were medically necessary.

67.     Nonetheless, Defendants submitted claims to Medicare for these medically unnecessary services, notwithstanding the fact that the services had been provided, not due to patient need, but as a result of Defendants' own business desire to facilitate Samadi's uninterrupted presence in the operating room.

## IV.     Defendants' Internal Policies

68.     In their rush to profit from their investment in Samadi, Defendants adopted hospital practices that not only flew in the face of governing law, but also their own internal hospital policies.

69.     For example, although residents in their second year of specialized urology training, which at Lenox Hill was the fourth year of the overall residency training, were routinely left without direct supervision in OR 21, Lenox Hill's Urology Department supervision policy from May 2017 through July 2017, specifically provided that a resident must be in the fifth or sixth year of their residency before they could be left to perform surgical procedures in the operating room without an attending physician present.

70.     Similarly, during this time period, Northwell had a policy entitled "Physicians at Teaching Hospitals (PATH) Supervision and Billing Policy" (the "PATH Policy"), which was in effect from October 2016 through at least July 1, 2017. In its General Statement of Purpose, the

PATH Policy stated that "[t]he purpose of this policy is to ensure that Physicians in a Teaching environment working with members of the House Staff at Northwell Health are in compliance with federal, state, Joint Commission and Northwell Health requirements." The PATH Policy further states that it applies, "to all members of the Northwell Health workforce including, but not limited to: employees, medical staff . . . . and other persons performing work for or at . . . any Northwell Health facility." Mirroring both the regulations and the Medicare Claims Processing Manual, the PATH Policy prescribes that: "For major [surgical] procedures (lasting more than 5 minutes), the Teaching Physician must be Physically Present during all 'Critical or Key Portion(s)' of the service and must be Immediately Available to furnish service during the entire procedure." The policy further defines "Immediately Available" to mean "being able to attend a patient immediately when called and, therefore, *not* simultaneously involved in the Key portion of care for another patient." (emphasis in original). To avoid any confusion, the policy further stated that "[w]hen a Teaching Physician is not present during non-Critical non-Key Portions of the procedure and is participating in another surgical procedure, he/she must arrange for another qualified surgeon to immediately assist the resident in the other case should the need arise." Moreover, the PATH Policy also provided, under the section titled "Teaching Physician Requirements for Endoscopy," that "[t]he Teaching Physician must be present in the room for the entire viewing from the time the scope is inserted to the time the scope is removed."

71.     At the end of the PATH Policy, under the section entitled References to Regulations and/or Other Related Policies, the PATH Policy expressly cites to both the Medicare regulations regarding payment for physician services in a teaching setting, as well as the chapter of the Medicare Claims Processing Manual which includes the sections that speak to Medicare's requirements for payments made for surgical services provided in a teaching setting.

72.     Defendants therefore allowed Samadi to engage in non-compliant surgical practices in spite of the fact that these practices violated Defendants' own formal policies and procedures. Indeed, Defendants' own formal policies and procedures cite to the very Medicare regulations and rules that Samadi's surgical practices violated.

73.     Accordingly, in order to realize a return on their significant investment in Samadi, Defendants empowered and encouraged Samadi to adopt surgical practices that not only flew in the face of regulatory requirements, but which Defendants themselves knew were neither compliant nor consistent with Defendants' certifications to Medicare.

## V.     Defendants' Billing and Compliance Practices

74.     Defendants expended significant effort to maximize Samadi's productivity, and, by extension, his collections. At the same time, however, Defendants made little to no effort to ensure the accuracy of the claims they submitted to Medicare.

75.     In spite of their knowledge that the surgical practices in OR 21 and OR 25 violated Medicare rules and regulations, Defendants routinely submitted claims to Medicare for payment associated with both OR 21 and OR 25. These claims for payment included claims for Samadi's professional services, as well as claims for services provided by hospital staff, such as anesthesiologists, nurses, and technicians, working in conjunction with Samadi.

76.     Moreover, Lenox Hill undertook little to no oversight of Samadi's individual billing activity and made no effort to ensure regulatory compliance in the calculation of Samadi's compensation. Lenox Hill never sought to audit any of Samadi's medical billings, and never inquired into the details of his billing activity or provided guidance as to how claims should be submitted.

77.     Accordingly, in addition to the false claims submitted to Medicare stemming from Samadi's non-compliant surgical practices, Defendants also submitted claims that did not comply with the Stark Law.

78.     Defendants never advised its own employee involved in calculating Samadi's compensation or Samadi's private medical billing service of the terms of Samadi's employment agreement, and Defendants took no steps to instruct these individuals on what collections could properly be used to calculate the incentive bonus portions of Samadi's compensation.

79.     As a result, Defendants made payments to Samadi that not only violated the law, but also violated the terms of the formal employment contract that Lenox Hill had itself negotiated. While Samadi's employment agreement expressly stated that his incentive compensation should not be calculated from "services where [Samadi] acts primarily as a supervisor," because Defendants failed to educate those responsible for calculating Samadi's incentive compensation on these terms, Samadi's incentive bonus routinely incorporated the collections associated with services that had been performed by those under his supervision.

80.     Similarly, although Samadi's employment agreement acknowledged that the Stark Law precludes hospitals from entering into employment arrangements that provide renumeration to a physician in exchange for designated health services not performed by the physician, internal hospital documents make clear that Defendants were well aware that, without taking into account referrals for designated health services, Samadi's employment arrangement was not commercially reasonable.

81.     Furthermore, in the summer of 2018, Defendants revisited Samadi's employment arrangement. At that time, Defendants elected to reduce Samadi's compensation by approximately $2.5 million dollars. Sullivan Cotter, a consultant retained by Defendants to

provide an opinion on the fair market value of this compensation arrangement, opined at that time that Samadi's new employment arrangement, in which he received $2.5 million less compensation than he was guaranteed from July 1, 2013, through June 30, 2018, was still 1.5% higher than the "total compensation fair market value benchmark." Defendants therefore had knowledge that Samadi's initial compensation terms could not have been fair market value.

82.     Defendants' false certifications of compliance with Medicare laws, rules, and regulations, including the Stark Law and the Anti-Kickback Statute, were material to the Government's decision to pay claims that Defendants submitted to Medicare. Had the Government been aware of Defendants' fraudulent practices, the Government would not have paid these claims.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violations of the False Claims Act: Presenting False Claims for Payment (31 U.S.C. § 3729(a)(1)(A))

83.     The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

84.     The Government seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(A).

85.     Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims to the Government for payment.

86.     The Government made payments to Defendants pursuant to Medicare because of the false or fraudulent claims.

87.     If the Government had known that the claims that were presented to Medicare were for services not medically necessary, and/or not in compliance with applicable Medicare rules and regulations, the Government would not have paid the claims.

88.     By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

89.     By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## SECOND CLAIM

### Violations of the False Claims Act: Use of False Statements
### (31 U.S.C. § 3729(a)(1)(B))

90.     The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

91.     The Government seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(B).

92.     Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, and caused to be made and used, false records and statements material to the payment of false or fraudulent claims by Medicare.

93.     The Government paid such false or fraudulent claims because of the acts and conduct of the Defendants.

94.     By reason of these false records and statements, the Government has sustained

damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a

civil penalty for each violation.

### THIRD CLAIM

**Payment by Mistake of Fact**

95.     The Government incorporates by reference each of the preceding paragraphs as if

fully set forth herein.

96.     The Government seeks relief against Defendants to recover monies paid under

mistake of fact.

97.     The Government paid Defendants for claims based on the mistaken and erroneous

belief that the claims were for services that were medically necessary, and in compliance with

applicable Medicare rules and regulations. These erroneous beliefs, as well as the false

representations and records made by Defendants, were material to the Government's

determination to pay Defendants for the services billed.

98.     The Government would not have paid for claims had it known that the claims

were for services not medically necessary, and/or not in compliance with applicable Medicare

rules and regulations.

99.     By reason of the foregoing, the Government has sustained damages in a

substantial amount to be determined at trial.

### FOURTH CLAIM

**Unjust Enrichment**

100.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth herein.

101.    Through the acts set forth above, Defendants have received payments pursuant to Medicare to which they were not entitled and therefore were unjustly enriched.  The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the Government respectfully requests judgment to be entered in its favor against Defendants as follows:

a.      On the First and Second Claims (FCA violations), for a sum equal to treble damages and civil penalties to the maximum amount allowed by law;

b.      On the Third and Forth Claims (Payment by Mistake of Fact and Unjust Enrichment), a sum equal to the damages to be determined at trial, along with costs and interest; and

c.      For an award of costs, plus interest, as provided by law; and

d.      Granting the Government such further relief as the Court may deem proper.

Dated:  New York, New York
       November 4, 2019

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for United States of America*

By:     /s/ *Jessica Jean Hu*
      JESSICA JEAN HU
      ARASTU K. CHAUDHURY
      Assistant United States Attorneys
      86 Chambers St., 3rd Floor
      New York, New York 10007
      (212) 637-2726 / 2633
      jessica.hu@usdoj.gov
      arastu.chaudhury@usdoj.gov